**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TALENA COLBERT, ET AL.** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 26-255** |
| | : | |
| **NEWREZ LLC d/b/a/ SHELLPOINT MORTGAGE SERVICING** | : | |

**McHUGH, J.** **November 13, 2026**

## MEMORANDUM

Plaintiffs Talena Colbert, Martin Litwin, and Louis Cancelliere, on behalf of a class, bring federal and state claims against Defendant NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") arising out of collection activity on so-called "zombie mortgages." Plaintiffs allege that Shellpoint has, in violation of federal and state laws, sought to collect waived interest and fees on dormant second-mortgage obligations that it retroactively assessed without legal basis or notice. Shellpoint filed a partial motion to dismiss Plaintiffs' Second Amended Complaint ("Complaint").

A home is the most important asset of many Americans, one that most can acquire only by borrowing. But simple fixed-rate purchase-money mortgages are no longer the only way in which home purchases are financed, and more complex financial products can create vulnerabilities for homeowners, vulnerabilities that Plaintiffs here contend were exploited. Specifically, Plaintiffs claim that Shellpoint engaged in abusive mortgage practices featuring three primary elements: (1) the sudden resuscitation of long-abandoned second mortgages; (2) urgent demands for payment paired with foreclosure threats; and (3) retroactive assessments of thousands of dollars of previously-waived interest. Plaintiffs allege that, because of these practices, they have been forced to pay tens of thousands of dollars they did not owe or, worse, ended up in foreclosure proceedings that threaten the loss of their homes.

Congress has recognized these issues and outlawed unfair and deceptive practices by debt collectors and imposed minimum investigation and communication standards for mortgage servicers. Taking the Complaint's factual allegations as true, Plaintiffs have plausibly alleged that Shellpoint violated several federal consumer financial protection laws. But Plaintiffs have failed to sufficiently plead the requisite elements for parallel claims under Pennsylvania state law and have not opposed the dismissal of several other claims. The pending motion to dismiss will therefore be granted in part.

## I. Facts as Pled

Talena Colbert and Louis Cancelliere are residents of Pennsylvania. ECF No. 31 ¶¶ 11, 13. Martin Litwin is a resident of Illinois. *Id.* ¶ 12. NewRez LLC ("NewRez") is a Delaware limited liability company and the successor-in-interest to Specialized Loan Servicing ("SLS"), a mortgage servicer. *Id.* ¶ 14. Shellpoint is a wholly-owned mortgage-servicing unit of NewRez. *Id.* ¶ 15.

### A. General Industry Background

A "mortgage servicer is the company that sends" consumers their "mortgage statements and handles the day-to-day tasks for managing" their loans. Consumer Fin. Protection Bureau ("CFPB"), *What's the difference between a mortgage lender and a mortgage servicer?* (Dec. 11, 2024), https://www.consumerfinance.gov/ask-cfpb/whats-the-difference-between-a-mortgage-lender-and-a-mortgage-servicer-en-198/. Servicers are subject to numerous federal and state consumer financial protection laws and regulations. ECF No. 31 ¶ 19. At the federal level, these rules include the Truth in Lending Act ("TILA") and its implementing Regulation Z, the Fair Debt Collection Practices Act ("FDCPA") and its implementing Regulation F, and the Real Estate Settlement Procedures Act ("RESPA") and its implementing Regulation X. And under

Pennsylvania law, servicers must comply with the state's Fair Credit Extension Uniformity Act ("FCEUA") and Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

Mortgage servicers provide information to borrowers about their loan accounts on a regular basis. *Id.* ¶ 16. Under industry practice, servicers increase the frequency of communications when a loan is delinquent. *Id.* Regular communication allows borrowers to make informed decisions about how to stay current on their mortgage obligations. *See id.* ¶ 23. Conversely, borrowers lack important information about their accounts in periods where there is no contact—like the amount of owed payments, the consequences of default, and the identity of their servicer. *Id.* This missing information can be critical when a loan is in default, and a lack of communication by a servicer can impair a borrower's ability to improve the situation through loss mitigation or refinancing. *Id.* ¶ 24. Borrowers who do not hear from a servicer for an extended period may become confused about their payment obligations, especially if the servicer stops furnishing information about the account to credit reporting agencies. *Id.* ¶ 25.

Mortgage servicers generally work as agents for the owner of a pool of mortgage loans. *Id.* ¶ 26. In this work, servicers undertake the important process of communicating with borrowers and managing their accounts. *Id.* ¶ 27. This process is costly, and servicers face competitive incentives to reduce these costs. *Id.* ¶¶ 27, 29. Servicers take in revenue from servicing fees and collection commissions. *Id.* ¶¶ 26, 28. For loans in good standing, servicers take a percentage fee of the principal balance of the total loan pool. *Id.* ¶ 26. But for defaulted loans, servicers instead receive a percentage commission of any amounts they collect. *Id.* ¶ 28.

In the buildup to the "Great Recession," mortgage lenders created an "80/20" mortgage product in which a lender would issue borrowers two separate mortgage loans to buy one home.

*Id.* ¶ 2, 9 ¶ 32.[1] The first mortgage, amounting to about 80 percent of the home value, served as a traditional purchase-money mortgage. *Id.* ¶ 2, 9 ¶ 32. The second mortgage covered the remaining 20 percent of the sale. *Id.* ¶ 2, 9 ¶ 32. These second mortgages sometimes included predatory features, such as balloon payments and escalating interest rates. *Id.* ¶ 2. When the Great Recession hit, declining property values left many second mortgages underwater. *Id.* ¶ 3. As pleaded by Plaintiffs, according to the CFPB, "many second mortgage holders . . ., recognizing that a foreclosure would not generate enough money to cover even the first mortgage, charged their defaulted loans off as uncollectible and ceased communicating with the borrowers. . . . Many borrowers, having not received any notices or periodic statements for years, concluded that their second mortgages had been modified along with the first mortgage, discharged in bankruptcy, or forgiven." *Id.* at 9 ¶ 32. Put differently, ordinary consumers likely believed that these second-mortgage obligations were "dead." *Id.* ¶ 3.

But they were not. Property values recovered around the time of the COVID-19 pandemic, pulling these second mortgages out of the grave and back above water. *Id.* ¶ 4, 9 ¶ 32. Debt buyers and servicers reanimated these obligations as so-called "zombie mortgages," demanding payments on debts that consumers thought gone. *Id.* These firms often combined payment demands with threats of foreclosure. *Id.* ¶ 5, 9 ¶ 32. And they often went back to assess interest for the prior periods in which the loan had been abandoned. *Id.* ¶ 5. Overall, these "zombie mortgage" practices featured three primary elements: (1) the sudden resuscitation of long-abandoned second

[1] The Complaint inadvertently contains two sets of paragraphs numbered 30 through 50. For paragraphs with these numbers, I include the page number.

mortgages; (2) urgent demands for payment paired with foreclosure threats; and (3) retroactive interest assessments. *Id.* ¶¶ 4-5, 9 ¶ 32.

**B. Shellpoint and Plaintiffs**

Plaintiffs allege that Shellpoint, on its own and through its predecessor-in-interest SLS, has been a participant in this consumer financial horror story. *Id.* ¶¶ 6-7, 9-11 ¶¶ 33-39. According to Plaintiffs, from about 2015 to 2024, SLS purchased the servicing rights to second-mortgage obligations that went dormant after the Great Recession. *Id.* ¶ 6, 9 ¶ 33. SLS began retroactively assessing interest and fees on these loans that prior servicers had allegedly waived. *Id.* ¶ 6. SLS often operated by emerging, without warning, with demands for large payments on these long-defaulted loans accompanied by notices of intent to foreclose. *Id.* ¶ 6, 10 ¶ 35. SLS merged into NewRez in 2024. *Id.* ¶ 7. NewRez assigned to Shellpoint the servicing of the second-mortgage obligations that SLS had covered. *Id.*

Colbert bought a home in West Philadelphia in 2007. *Id.* at 11 ¶ 40. To finance the purchase, Colbert entered into two mortgages with First Franklin Financial Corporation ("First Franklin"). *Id.* at 11 ¶ 42; ECF No. 31-1 at 2-7. Neither SLS, NewRez, nor Shellpoint were a party to the second mortgage. ECF No. 31-1 at 2-7. Colbert stayed current on the first mortgage with the assistance of a loan modification. ECF No. 31 at 12 ¶ 45. But Colbert made her last payment on the second mortgage in July 2009, and the loan went into default the following month. *Id.* at 11 ¶ 44. After she stopped making payments on the second mortgage, Colbert stopped receiving periodic statements from First Franklin or any other servicer. *Id.* at 12 ¶ 46. The lack of communication or credit reporting about the loan, combined with Colbert's regular payment of her first mortgage obligation, led to confusion about what, if any, obligation remained from the second mortgage. *Id.* at 12 ¶ 47.

Colbert did not hear anything about the second mortgage until 2020, when she received a payment demand from SLS. *Id.* at 12 ¶ 48. SLS did not begin sending Colbert account statements until two years later, and even then the statements were irregular. *Id.* at 12 ¶ 49. Colbert alleges that First Franklin and subsequent servicers waived monthly interest accruals between the second mortgage loan's default in 2009 and her first contact from SLS in 2020 based on industry charge-off practices and the lack of communication during this period. *Id.* at 12 ¶ 50. SLS, though, appeared to claim about $50,000 in interest from this time in its correspondence with Colbert. *Id.* at 12 ¶ 30. SLS eventually filed a foreclosure complaint on the second mortgage, alleging that Colbert owed more than $80,000. *Id.* at 13 ¶¶ 32-33. This amount included interest at the original note rate for every month since August 2009, as if the loan was never charged off. *Id.* at 13 ¶ 34. Shellpoint is now prosecuting the foreclosure and has continued to send periodic statements reflecting the accrual of the allegedly waived interest. *Id.* at 13 ¶ 36, 14 ¶¶ 39-40. Colbert has suffered a reduction in the home equity she owns due to Shellpoint's allegedly wrongful interest assessment. *Id.* at 14 ¶ 41.

In July 2024, Colbert sent Shellpoint a written information and error-correction request. *Id.* at 14 ¶ 37. Colbert requested information about the loan, including the identity of the loan's owner; the servicing, payment, and charge-off histories; copies of communications and monthly statements; and a breakdown of claimed arrears or delinquencies. ECF No. 31-1 at 13-14. Colbert also requested the removal of interest and fees for any month in which no monthly billing statement was sent to her. *Id.* at 14. Shellpoint replied in October 2024. ECF No. 31 ¶ 38. Shellpoint declined the error-correction request on the grounds that the "dispute does not provide any specific details or event regarding servicing errors or any other specific information on which we can form the basis for further investigation." ECF No. 31-1 at 17. Plaintiffs allege that Shellpoint's behavior

is part of a pattern of mishandling consumer inquiries about second-mortgage accounts and point to Shellpoint's handling of an inquiry by consumer Mariel Castellon of Virginia as another example. ECF No. 31 ¶ 118.

Litwin purchased a home in Illinois in 2004. *Id.* at 14 ¶ 42. Countrywide Mortgage ("Countrywide") refinanced Litwin into a two-mortgage, 80/20 product in 2006. *Id.* Countrywide structured the second mortgage as a fully-drawn home equity line of credit ("HELOC"). *Id.* at 15 ¶ 43; ECF No. 31-2 at 2-11. Neither SLS, NewRez, nor Shellpoint were parties to the second mortgage. ECF No. 31-2 at 2-11. The second mortgage's terms provided for Litwin to receive a periodic statement at the end of each month in which a finance charge was imposed. ECF No. 31 at 15 ¶ 44. Litwin made payments on the second mortgage until April 2012. *Id.* at 15 ¶ 45. Shortly thereafter, Litwin filed for Chapter 7 bankruptcy. *Id.* at 15 ¶ 46. Litwin received a discharge in July 2012, extinguishing his personal liability on the second mortgage. *Id.* Litwin stopped receiving monthly statements at this point. *Id.* at 15 ¶ 48.

SLS obtained the collection rights to the second mortgage after the discharge. *Id.* at 15 ¶ 49. SLS never sent Litwin periodic mortgage statements. *Id.* at 15 ¶ 50. According to Litwin, SLS's failure to send these statements indicated that it was not assessing fees or interest on the loan and waived its right to collect those amounts. *Id.* ¶ 51. Shellpoint began sending Litwin monthly statements when it acquired his account in May 2024. *Id.* ¶ 52. These statements included retroactive interest and fees for the period in which Litwin was not receiving statements or other communications from SLS or other servicers. *Id.* ¶ 53. Litwin decided to sell his home in 2025 and requested a payoff statement from Shellpoint. *Id.* ¶¶ 54-55. In response, Shellpoint informed Litwin that he owed more than $145,000 on the second mortgage. *Id.* ¶ 56; ECF No. 31-3 at 2-6. This payoff amount included retroactively-assessed interest that Litwin alleges had previously

been waived. ECF No. 31 ¶¶ 56, 58. Litwin had to pay these amounts so that he could convey clear title in the sale, resulting in damages of more than $75,000. *Id.* ¶¶ 58-59.

Cancelliere purchased a home in Pittsburgh in 2004. *Id.* ¶ 60. In 2006, Cancelliere and his ex-spouse obtained a HELOC, secured by a second mortgage on the home, from Home Loan Center, Inc. ("LendingTree Loans"). *Id.* ¶ 61; ECF No. 31-3 at 8-9. Neither SLS, NewRez, nor Shellpoint were a party to the loan contract. ECF No. 31-3 at 8-9. Cancelliere or his ex-spouse made payments on the loan until 2010. ECF No. 31 ¶ 63. At this time, the loan was charged off and the then-servicer stopped sending Cancelliere monthly statements. *Id.* Cancelliere did not get any more monthly statements for the second mortgage until 2017. *Id.* ¶¶ 64-65. Cancelliere received monthly statements from Ditech Financial ("Ditech") from February 2017 to July 2017 that indicated that the loan was not accruing interest. *Id.* ¶¶ 65-66.

The Ditech statements stopped after July 2017, and SLS eventually became the servicer of the loan. *Id.* ¶ 67. SLS failed to send monthly statements to Cancelliere for years. *Id.* ¶ 68. In January 2024, however, SLS sent Cancelliere a Notice of Default and Notice of Intent to Foreclose representing that Cancelliere owed more than $50,000 to bring the second mortgage current. *Id.* ¶ 69. Most of this amount was retroactive interest for the periods in which Cancelliere had not received monthly statements, despite Ditech's representation that interest accrual had stopped. *Id.* Shellpoint took over the servicing of Cancelliere's loan in May 2024 and is currently attempting to foreclose on Cancelliere's home in Pennsylvania state court. *Id.* ¶¶ 70-72. Shellpoint is seeking tens of thousands of dollars in interest and fees for periods in which servicers did not send Cancelliere statements or told him interest was not accruing. *Id.* ¶ 72. Cancelliere has suffered damages in the amount of his lost equity due to Shellpoint's misrepresentations. *Id.* ¶ 73.

## II. Standard of Review

Within the Third Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F. 3d 203, 210 (3d Cir. 2009).

## III. Discussion

Shellpoint moves to dismiss five of six counts in the Complaint. Counts One and Two of the Complaint allege violations of the FDCPA. Count Three alleges violations of the FCEUA. Count Four alleges violations of the UTPCPL. Count Five alleges violations of RESPA. Count Six alleges violations of Illinois state law. The Court has federal-question jurisdiction over the FDCPA and RESPA claims, and supplemental jurisdiction over the FCEUA, UTPCPL, and Illinois claims. *See* 28 U.S.C. §§ 1331, 1367(a).

### A. Count One: FDCPA Section 807

By way of background, the FDCPA is a consumer-protection statute regulating the practices of debt collectors that the Third Circuit has recognized also seeks to promote fair competition. "Congress enacted the FDCPA to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *Moyer v. Patenaude & Felix, A.P.C.*, 991 F. 3d 466, 469 (3d Cir. 2021) (quoting *Rotkiske v. Klemm*, 589 U.S. 8, 10 (2019)). In Count One, Plaintiffs allege, on behalf of a class, that Shellpoint violated Section 807 of the FDCPA. "To prevail on an FDCPA claim, a plaintiff must prove that (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the

debt." *Id.* at 470 (quoting *Jensen v. Pressler & Pressler*, 791 F. 3d 413, 417 (3d Cir. 2014)). Shellpoint only challenges the fourth element of each claim.

Section 807 of the FDCPA provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The statute specifically prohibits false representations about "the character, amount, or legal status of any debt." *Id.* § 1692e(2)(A). Plaintiffs allege that Shellpoint violated this bar when it demanded payment of waived interest. ECF No. 31 ¶ 85.

As to Litwin, Shellpoint has only moved to dismiss his claim to the extent it is based on TILA. ECF No. 37. Because his FDCPA § 807 claim turns on waiver under state contract law, ECF No. 40 at 22-25, I will deny the motion to dismiss Count One with respect to Litwin.

As to Cancelliere, Shellpoint argues that his FDCPA § 807 claim is untimely. ECF No. 37-1 at 22-23. Cancelliere has not directly opposed Shellpoint's position, instead arguing that his FDCPA claims survive under the FCEUA, because the filing of the initial class complaint tolled the running of time. ECF No. 40 at 35. I will therefore grant the motion to dismiss Count One with respect to Cancelliere and dismiss with prejudice.

As to Colbert, Shellpoint argues that her FDCPA § 807 claim attempts to plead a non-viable TILA claim through the FDCPA. ECF No. 37-1 at 14-17. Colbert responds that Shellpoint has independently violated the FDCPA by attempting to collect waived interest. ECF No. 40 at 18-19, 22-25. She argues that interest was waived as a matter of contract law, and that Shellpoint therefore misrepresented the amount of the debt in violation of the FDCPA's deception prohibition. *Id.* at 22-25. Shellpoint asserts that Colbert's waiver argument runs afoul of the Statute of Frauds. ECF No. 41 at 16-18. I take these issues in turn.

*1. Waiver*

Shellpoint's TILA objection is misplaced here, as Colbert relies on Pennsylvania contract law to allege waiver. A party can waive contractual rights under Pennsylvania law. "A waiver in law is the act of *intentionally* relinquishing or abandoning some known right, claim or privilege." *Brown v. City of Pittsburgh*, 409 Pa. 357, 360 (1962). "Waiver is essentially a matter of intention. It may be expressed or implied." *Id.* Colbert explains that the charge-off and accompanying period of suspended communication reflected an intentional relinquishment of the right to collect interest in exchange for tax and cost advantages. ECF No. 31 at 12 ¶ 50; ECF No. 40 at 23. At this stage, this claim adequately pleads waiver—and therefore an associated FDCPA § 807 violation.[2] *See Stratton v. Portfolio Recovery Assocs., LLC*, 770 F. 3d 443, 451 (6th Cir. 2014) (finding plausible FDCPA violation where debt collector tried to collect interest after waiver); *Grochowski v. Daniel N. Gordon, P.C.*, No. 13-343, 2015 WL 3407441, at *5 (W.D. Wash. May 26, 2015) (same); *Terech v. First Resolution Mgmt. Corp.*, 854 F. Supp. 2d 537, 544 (N.D. Ill. 2012) (same).

*2. Statute of Frauds*

Shellpoint argues that the Statute of Frauds forecloses Colbert's waiver argument. "The statute of frauds directs that agreements for the sale of real estate shall not be enforced unless they are in writing and signed by the seller. The purpose of the statute is to prevent perjury and fraudulent claims." *Empire Props., Inc. v. Equireal, Inc.*, 449 Pa. Super. 476, 485 (1996) (quoting

[2] Shellpoint's assertion that a "temporary decision by one non-party servicer not to charge interest for a period does not permanently extinguish the contractual right for all subsequent servicers" is beside the point. ECF No. 41 at 20. The servicer's past waiver of the right to charge interest is at issue, not a prospective waiver of any right to charge interest ever. *Cf. Mun. Auth. of Westmoreland Cnty. v. CNX Gas Co., L.L.C.*, 380 F. Supp. 3d 464, 470 (W.D. Pa. 2019) ("Waiver of a contractual right is not necessarily permanent. For example, a party may waive a particular contractual right temporarily, but later retract that waiver and demand strict compliance with the provision *going forward*.") (emphasis added).

*Hostetter v. Hoover*, 378 Pa. Super. 1, 7 (1988)). The Statute of Frauds "is to be used as a shield and not as a sword, as it was designed to prevent frauds, not to encourage them." *Id.* at 486 (quoting *Fannin v. Cratty*, 331 Pa. Super. 326, 332 (1984)). "On a Rule 12(b)(6) motion, an affirmative defense, such as the statute of frauds defense . . ., is appropriately considered only if it presents an insuperable barrier to recovery by the plaintiff." *Flight Sys., Inc. v. Elec. Data Sys. Corp.*, 112 F. 3d 124, 127 (3d Cir. 1997).

Shellpoint cannot meet the insuperable-barrier standard for several reasons. First, although "Pennsylvania case law holds that any agreement to modify a mortgage or refrain from enforcing its terms is subject to the statute of frauds and must be in writing," *In re Cmwlth. Renewable Energy, Inc.*, 540 B.R. 173, 188 (Bankr. W.D. Pa. 2015), Colbert does not argue that Shellpoint has permanently agreed to waive interest, only that her servicer unilaterally waived interest during past periods. Modification is different from waiver. *Cf. H.B. Alexander & Son, Inc. v. Miracle Recreation Equip. Co.*, 314 Pa. Super. 1, 6 (1983) (finding that, under the commercial statute of frauds, a party waived the statute of frauds through its conduct and course of dealing). Second, the alleged facts present no risk of fraud or perjury. To the contrary, Shellpoint seeks to use the Statute of Frauds as a sword to undo an alleged long-past waiver of thousands of dollars of interest. *Cf. Long v. Brown*, 399 Pa. Super. 312, 319 (1990) ("Pennsylvania courts have emphasized that the Statute is *not* designed to prevent the performance or enforcement of oral contracts that in fact *were* made.") (quoting *Hessenthaler v. Farzin*, 388 Pa. Super. 37, 42 (1989)). And third, even assuming that the Statute of Frauds applies, discovery could uncover a written document reflecting the charge-off decision that would be sufficient to satisfy the Statute of Frauds or elicit third-party testimony admitting the existence of the waiver. *See Flight Sys.*, 112 F. 3d at 128; *Target*

*Sportswear, Inc. v. Clearfield Found.*, 327 Pa. Super. 1, 16-17 (1984). For these reasons, dismissal on Statute of Frauds grounds is unwarranted.[3]

Overall, I conclude that Colbert has plausibly alleged that Shellpoint sought to collect on retroactively-assessed, waived interest. I will therefore deny the motion to dismiss Count One with respect to Colbert.

**B. Count Two: FDCPA Section 808**

In Count Two, Plaintiffs allege, on behalf of a class, that Shellpoint violated Section 808 of the FDCPA. FDCPA § 808 states that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. The statute contains a non-exhaustive list of enumerated unfair practices, including "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* § 1692f(1). "The FDCPA is a remedial statute," and courts in the Third Circuit "construe its language broadly so as to effect its purposes." *Allen v. LaSalle Bank, N.A.*, 629 F. 3d 364, 367 (3d Cir. 2011).

As to Cancelliere, Shellpoint argues that his FDCPA § 808 claim is also untimely. ECF No. 37-1 at 22-23. Cancelliere has not opposed Shellpoint's position, and I will grant the motion to dismiss Count Two with respect to Cancelliere with prejudice.

As to Litwin, like with respect to Count One, Shellpoint has only moved to dismiss Litwin's claim to the extent it is based on TILA. ECF No. 37. For the reasons discussed below in evaluating

[3] The parties have not briefed Shellpoint's standing to raise a Statute of Frauds defense. I note that Shellpoint was not a party to the second-mortgage agreement, but that Shellpoint may have successor status that allows it to raise this defense. *See* Restatement (Second) of Contracts § 144 (1981).

the TILA issues raised by Colbert's claim, I will deny the motion to dismiss Count Two with respect to Litwin.

As to Colbert, Shellpoint argues that her FDCPA § 808 claim again improperly attempts to state a non-viable TILA claim via the FDCPA. ECF No. 37-1 at 14-17. Colbert responds that Shellpoint independently violated the FDCPA's general unfairness prohibition through the overall zombie-mortgage scheme she alleges, one component of which implicates the FDCPA's specific prohibition on collecting amounts not expressly authorized by a loan agreement or permitted by law when Shellpoint imposed interest during periods where Regulation Z prohibited retroactive interest assessments. ECF No. 40 at 25-28. I address each issue.

1. *TILA Objection*

As a threshold matter, Shellpoint argues that Plaintiffs cannot use the FDCPA as a proxy to enforce TILA. ECF No. 37-1 at 14-17. The CFPB has administered Regulation Z as TILA's implementing regulation. Regulation Z requires servicers to provide periodic statements for residential mortgage loans. 12 C.F.R. § 1026.41. Regulation Z contains an exception to this periodic statement requirement for "charged-off loans." *Id.* § 1026.41(e)(6). Under this exception, a servicer does not have to provide a periodic statement if it (1) charges off the loan and will not charge any additional fees or interest on the account; and (2) provides a charge-off notice explaining the situation to the consumer. *Id.* § 1026.41(e)(6)(i). If a servicer fails at any time to treat a loan as charged off or charges any additional fees or interest on the account, the obligation to provide a periodic statement resumes. *Id.* § 1026.41(e)(6)(ii)(A). The regulation prohibits servicers from retroactively assessing fees or interest on the account for the period of time during which the charged-off exception applied to the account. *Id.* § 1026.41(e)(6)(ii)(B). But

enforcement of this part of Regulation Z is generally left to regulatory authorities; there is no private right of action against most mortgage servicers. *See* 15 U.S.C. § 1641(f).

This has led various district courts to conclude that consumers cannot invoke a violation of TILA or Regulation Z as the basis for an action against loan servicers. *See, e.g.*, *Sellers v. NewRez LLC*, No. 25-35, 2026 WL 632357, at *6 (D. Md. Mar. 6, 2026); *Tuttle v. NewRez, LLC*, No. 25-223, 2026 WL 497010, at *4 (M.D.N.C. Feb. 23, 2026); *see also Stump v. WMC Mortg. Corp.*, No. 02-326, 2005 WL 645238, at *10 (E.D. Pa. Mar. 16, 2005). If Colbert were simply alleging a violation of TILA, these decisions would have greater persuasive force. But Section 808 is written in broad terms, prohibiting "unfair or unconscionable means" to collect a debt. Colbert's theory is not that Shellpoint violated the FDCPA solely by virtue of its failure to issue periodic statements in violation of Regulation Z. Rather, Colbert alleges that Shellpoint engaged in an overall zombie-mortgage collection scheme—including the pursuit of amounts that Regulation Z does not permit together with sudden threats of foreclosure after long periods of noncommunication, and the retroactive assessment of waived interest—and that this combination of efforts represents a violation of the FDCPA. And a debt collector's attempt to collect amounts prohibited by other law can state a claim under the FDCPA, regardless of whether the source of that prohibition is TILA, state contract law, or another statute or regulation. Another member of this Court recently denied a motion to dismiss an FDCPA claim against Shellpoint involving similar facts. *See Huratiak v. NewRez LLC*, No. 25-6691, 2026 WL 2742069, at *3 (E.D. Pa. Sept. 15, 2026) (Gallagher, J.) ("Accepting the allegations in the SAC as true, and construing all inferences therefrom in the light most favorable to Plaintiff, Shellpoint's failure to send periodic statements to Plaintiff, after initially providing such statements, could be considered a deceptive or misleading debt collection practice in violation of the FDCPA.").

Overlap between statutes is not a novel issue. "When two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Simon v. FIA Card Servs., N.A.*, 732 F. 3d 259, 274 (3d Cir. 2013) (quoting *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l., Inc.*, 534 U.S. 124, 143-44 (2001)) (alteration in original); *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both.") (internal quotation marks omitted). Other circuit courts have recognized that there is some degree of interrelationship between federal consumer financial laws. *Daniels v. Select Portfolio Servicing, Inc.*, 34 F. 4th 1260, 1269 (11th Cir. 2022) (quoting *Epic Systems*); *Lamirand v. Fay Servicing, LLC*, 38 F. 4th 976, 980 (11th Cir. 2022) (same). A mortgage servicer must comply with TILA requirements and FDCPA requirements. *See Daniels*, 34 F. 4th at 1272 ("As some courts have noted, a debt collector can satisfy the TILA requirements and at the same time comply with the harassment, misrepresentation, and unconscionable practices provisions of the FDCPA, which was passed after the TILA.") (citations omitted); *Lamirand*, 38 F. 4th at 980 (TILA "requires a servicer to send periodic statements, and the FDCPA requires those statements to be fair and accurate when they contain language that would induce a debtor to pay. The statutes thus reinforce each other, ensuring that consumers receive both regular and accurate information about their mortgage loans."). Moreover, to the extent that district courts must define and give meaning to what represents unfair or unconscionable practices, as discussed below, reference to other federal statues provides a useful and more objective metric because such statutes embody the thinking of Congress.

Accordingly, I reject Shellpoint's argument that Colbert (and Litwin) are indirectly and improperly pleading a TILA claim through the FDCPA.

2. *FDCPA Section 808: General Unfairness Prohibition*

Colbert alleges that Shellpoint violated the FDCPA's general prohibition on unfair practices. *See* 15 U.S.C. § 1692f. Courts analyzing claims under the FDCPA's general unfairness prohibition have defined unfairness as "shockingly unjust or unfair, or affronting the sense of justice, decency, or reasonableness," and have looked to whether a defendant has abused its "superior economic position and level of sophistication." *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F. 3d 128, 135 (2d Cir. 2017) (quoting *Gallego v. Northland Grp. Inc.*, 814 F. 3d 123, 128 (2d Cir. 2016)); *Adams v. Law Offices of Stuckert & Yates*, 926 F. Supp. 521, 528 (E.D. Pa. 1996).[4] Colbert alleges that Shellpoint hid its identity from obligated consumers and

[4] Congress's decision to ban unfair practices through the FDCPA followed on enforcement of Section 5 of the Federal Trade Commission Act, which prohibits unfair methods of competition and unfair or deceptive acts or practices. 15 U.S.C. § 45(a)(1); *see generally State v. O'Neill Investigations, Inc.*, 609 P. 2d 520, 532-33 (Alaska 1980) (tracing the history of Section 5 in the debt-collection context); *Jeter v. Credit Bureau, Inc.*, 760 F. 2d 1168, 1172-74 (11th Cir. 1985) (same). At the time of the FDCPA's enactment, the Federal Trade Commission ("FTC") analyzed unfairness using three factors: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972) (internal quotation marks omitted). As observed by the Eleventh Circuit in *Jeter,* "[i]t would be anomalous for the Congress, in light of its belief that existing state and federal law was inadequate to protect consumers, to have intended that the legal standard under the FDCPA be *less* protective of consumers than under the existing 'inadequate' legislation." 760 F. 2d at 1173-74.

This does not mean that Congress imported these factors into the FDCPA. But the history is instructive on the understanding of unfairness when the FDPCA was passed and helps explain why Colbert's allegation is plausible. The alleged retroactive-interest practice is, at minimum, (1) within the "penumbra" of TILA and Regulation Z, (2) "oppressive" to affected consumers, and (3) causes substantial injury. *Cf. Linderman v. NewRez LLC*, 833 F. Supp. 3d 894, 910 n.14 (N.D. Ill. 2026) ("Linderman could probably find support . . . for the proposition that the failure to communicate for more than a decade, which resulted in the piling up of interest which might otherwise have been paid and which prevented a restructuring of the loan which

withheld communication regarding the amounts allegedly due, only to surface with foreclosure threats demanding thousands of dollars in retroactively assessed interest. ECF No. 31 ¶ 89. Given the importance of budgeting to the average consumer and the degree to which mortgages are taken out based upon expected monthly obligations, surprise obligations can have dire implications for the homeowner's ability to pay. This claim sufficiently alleges conduct that plausibly violates the FDCPA's general unfairness provision. A mortgage servicer who forces consumers to pay tens of thousands of dollars or seeks to foreclose on homeowners after years without communication based on amounts that consumers do not owe plausibly acts in a "shockingly unjust" manner. *Arias*, 875 F. 3d at 135. If a mortgage servicer has taken advantage of asymmetries in power and information about the consumer's account (information that the law required it to provide), that could plausibly represent an abuse of the servicer's "superior economic position and level of sophistication."[5] *Adams*, 926 F. Supp. at 528. I therefore deny Shellpoint's motion to dismiss Count Two with respect to Colbert's general FDCPA § 808 claim.

---

might have avoided her home ever being at risk, was 'immoral, unethical, oppressive, or unscrupulous' . . .").

[5] Notably, Colbert did not choose to engage with Shellpoint. As a general matter, consumers usually do not choose their mortgage servicer. *See, e.g.*, *In re NOVAD Mgmt. Consulting, LLC*, No. 2024-CFPB-0004 ¶ 22 (2024). Instead, the loan owner assigns a servicer to the consumer; the consumer has no say in the matter. Mortgage servicers are therefore insulated from the competitive dynamics present in well-functioning markets. Consumers like Colbert cannot "vote with their feet" if they dislike their servicer's behavior by shopping for a new servicer. *See, e.g.*, *id.* ¶ 35. And competing servicers cannot directly solicit consumers to switch based on higher-quality servicing work, a fact that can encourage irresponsible firms to outcompete by cutting costs through shortcuts or oppressive practices. Accordingly, consumers like Colbert must rely on statutes like the FDCPA to ensure fair treatment from their servicer. *See Moyer v. Patenaude & Felix, A.P.C.*, 991 F. 3d 466, 469 (3d Cir. 2021) (Congress enacted the FDCPA to protect consumers); *Jensen v. Pressler & Pressler*, 791 F. 3d 413, 419 (3d Cir. 2015) (the FDCPA enlists the efforts of sophisticated consumers as "private attorneys general" to aid their less sophisticated counterparts). And responsible servicers must also rely on these statutes to ensure their competitors do not compete unfairly by gaining cost advantages through abusive collection practices or shoddy servicing work. *See Moyer*, 991

*3. FDCPA Section 808(1): Enumerated Unfair Practice*

The FDCPA also specifically defines "[t]he collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law" as an unfair or unconscionable means of debt collection. 15 U.S.C. § 1692f(1). This provision prohibits a debt collector from collecting any amount unless it is either (1) expressly authorized by contract *or* (2) permitted by law. Colbert's loan agreement, as written, appears to expressly authorize the interest charges. ECF No. 31-1 at 2. Colbert therefore fails to state a claim under Section 808(1) of the FDCPA. *See Simkus v. Cavalry Portfolio Servs., LLC*, 12 F. Supp. 3d 1103, 1110 (N.D. Ill. 2014) (holding that even if a creditor waived its right to collect certain interest, a debt collector did not violate § 808(1) where the original agreement allowed for charging the interest).

The parties focused their arguments on whether the retroactive-interest charges were "permitted by law." ECF No. 40 at 26-28; ECF No. 41 at 18-19. Under Section 808(1), this focus is misplaced. A debt collector who seeks to collect on amounts expressly authorized by an agreement but prohibited by law may plausibly violate *other* FDCPA provisions, including Section 808's general unfairness prohibition. *See, e.g.*, *Kevelighan v. Trott & Trott, P.C.*, 771 F. Supp. 2d 763, 775 (E.D. Mich. 2010) ("[A]n attempt to collect an amount prohibited by law (but nonetheless expressly authorized by an agreement) gives rise to a cognizable FDCPA claim."). But this conduct does not fall within the scope of Section 808(1). I therefore grant Shellpoint's motion to dismiss Count Two with respect to Colbert's FDCPA § 808(1) claim with prejudice, as the provisions of the loan agreement indicate that leave to amend would be futile.

---

F. 3d at 469 (Congress also enacted the FDCPA to ensure firms who refrain from using abusive debt collection practices are not competitively disadvantaged).

**C. Count Three: FCEUA**

In Count Three, Plaintiffs allege, on behalf of the class, that Shellpoint violated the FCEUA by way of its FDCPA violations. "[A] debt collector's violation of the FDCPA constitutes a per se violation of the FCEUA." *Dicesari v. Asset Acceptance LLC*, No. 11-6815, 2012 WL 4108944, at *4 (E.D. Pa. Sept. 18, 2012) (citing 73 Pa. Stat. § 2270.4(a)).

As to Litwin, he does not oppose dismissal of his claim based on Shellpoint's purported "concession" that Litwin states a claim under a similar Illinois state law. ECF No. 40 at 10 n.1. Shellpoint disputes that it made such a concession, contending that it simply refrained from moving to dismiss the Illinois claim at this time. *See* ECF No. 41 at 9 n.1. I will grant Shellpoint's motion to dismiss Count Three with respect to Litwin with prejudice as unopposed.

Colbert has plausibly alleged violations of the FDCPA, and, apart from the time bar, Cancelliere has pled similar facts that could provide a basis for FDCPA liability.

"However, the FCEUA does not have its own private cause of action." *Matteo v. EOS USA, Inc.*, 2023 PA Super 51, 292 A. 3d 571, 581 (2023). Instead, plaintiffs must use the private right of action in the UTPCPL; "if a debt collector violates the FDCPA, it is an unfair or deceptive debt collection act under the FCEUA, which is a violation of the UTPCPL." *Id.* The UTPCPL generally requires a plaintiff to plead justifiable reliance and ascertainable loss along with prohibited conduct, and the Pennsylvania Superior Court has enforced this requirement with respect to FCEUA claims. *Id.*; *Kern v. Lehigh Vall. Hosp., Inc.*, 2015 PA Super 19, 108 A. 3d 1281, 1289-90 (2015). I am obligated to give these decisions from intermediate appellate courts due weight. *See Hunt v. U.S. Tobacco Co.*, 538 F. 3d 217, 220-21 (3d Cir. 2008) (stating that, in

the absence of authority from a state high court, federal courts applying state law must look to relevant state precedents).[6]

Cancelliere alleges that Shellpoint has attempted to foreclose on his home to collect interest he does not owe, causing him damages in the amount of lost equity. ECF No. 31 ¶ 73. Colbert alleges that she has suffered a reduction in home equity as a result of Shellpoint's wrongful interest assessments. *Id.* at 14 ¶ 41. These claims arguably plead ascertainable loss, as the ongoing foreclosure proceedings may render the loss of home equity sufficiently concrete to satisfy the FCEUA's pleading requirements. *Cf. Kaymark*, 783 F. 3d at 181; *Brock v. Thomas*, 782 F. Supp. 2d 133, 144 (E.D. Pa. 2011). But they do not sufficiently allege justifiable reliance, as neither Cancelliere nor Colbert has explained in what manner they relied on Shellpoint's representations about their loans. I therefore grant Shellpoint's motion to dismiss Count Three with respect to Cancelliere, Colbert, and the class, albeit without prejudice.

**D. Count Four: UTPCPL**

In Count Four of the Complaint, Litwin alleges, on behalf of a subclass, that Shellpoint violated the UTPCPL. Litwin does not oppose dismissal based on the "concession" discussed

[6] The Pennsylvania Supreme Court has not decided whether the justifiable reliance element applies to FCEUA claims that are derivative of FDCPA violations. ECF No. 40 at 39. Plaintiffs argue that mandating justifiable reliance would undermine several FCEUA protections and that requiring proof of justifiable reliance is not a good conceptual fit for many illegal debt collection practices. *Id.* at 40-42. But the Pennsylvania Superior Court has twice stated that FCEUA claims must plead the same elements as UTPCPL claims, including once in the specific context of derivative FDCPA violations. *See Matteo*, 292 A. 3d at 581; *Kern*, 108 A. 3d at 1290. The Third Circuit has followed one of these decisions, albeit on the question of whether FCEUA claims require a showing of ascertainable loss. *Kaymark v. Bank of Am., N.A.*, 783 F. 3d 168, 182 (3d Cir. 2015) (citing *Kern*). Plaintiffs advance compelling arguments, but my obligation as a district judge applying state law is to defer to existing appellate authority pending resolution by the Pennsylvania Supreme Court.

above. ECF No. 40 at 10 n.1. I therefore dismiss Litwin's claim and, consequently, the class claim with prejudice.

**E. Count Five: RESPA**

In Count Five of the Complaint, Colbert alleges, on behalf of a subclass, that Shellpoint violated RESPA. Section 6 of RESPA states that "[n]ot later than 30 days . . . after the receipt from any borrower of any qualified written request," a servicer must (1) make appropriate corrections in the account of the borrower; (2) conduct an investigation and respond with a statement of reasons for which the servicer believes the account to be correct; and/or (3) conduct an investigation and provide requested information or explain why requested information is unavailable. 12 U.S.C. § 2605(e)(2). Regulation X, the CFPB's implementing regulation for RESPA, provides that the investigation or search for information must be "reasonable." 12 C.F.R. §§ 1024.35(e), 1024.36(d); *see Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 804, 806 (E.D. Pa. 2014). Colbert alleges that her counsel sent a notice of error and information request to Shellpoint, Shellpoint did not remove the wrongful interest, and Shellpoint did not provide information about the charges. ECF No. 31 ¶¶ 114-116. Colbert attached a copy of Shellpoint's response, which provides little detail about its investigation or basis for denying the error-correction request. ECF No. 31-1 at 17-18. Taken together, these items plausibly allege that Shellpoint breached its duties under RESPA and Regulation X.

"A plaintiff claiming a RESPA violation must allege not only a breach of a duty required to be performed under RESPA, but must also show that the breach caused [her] to suffer damages." *Wilson*, 48 F. Supp. 3d at 799. Colbert alleges damages in the form of emotional distress including anxiety and despair as a result of Shellpoint's failures to correct errors or conduct reasonable

investigations. ECF No. 31 ¶ 117. These allegations are sufficient to plead damages at this stage.[7] *See, e.g.*, *Benner v. Bank of Am., N.A.*, 917 F. Supp. 2d 338, 365 (E.D. Pa. 2013). *Moody v. NewRez LLC*, No. 24-5406, 2025 WL 3909973, at *12 (N.D. Ga. Dec. 12, 2025), *report and recommendation adopted*, 2026 WL 2970496 (N.D. Ga. Aug. 17, 2026). I therefore deny Shellpoint's motion to dismiss Count Five.

**F. Count Six: Illinois Consumer Fraud and Deceptive Business Practices Act**

In Count Six of the Complaint, Litwin alleges, for himself, that Shellpoint violated the Illinois Consumer Fraud and Deceptive Business Practices Act. Shellpoint has not moved to dismiss this count at this time. ECF No. 37.

* * *

In sum, I grant Shellpoint's motion to dismiss Counts One and Two with respect to Cancelliere and deny the motion to dismiss with respect to Colbert and Litwin, except that I grant the motion to dismiss the portion of Colbert's Count Two claim that relies on Section 808(1) of the FDCPA. I grant the motion to dismiss Counts Three and Four with respect to all claims and deny the motion to dismiss Count Five with respect to all claims. Shellpoint did not move to dismiss Count Six.

[7] Shellpoint argues that Colbert's damages preceded the alleged RESPA violations, undermining causation. ECF No. 37-1 at 35-36. This argument fails to take into account that the Complaint specifically alleges Shellpoint's servicing failures caused Colbert additional emotional distress. ECF No. 31 ¶ 117. This allegation is sufficient to survive dismissal.

## IV. Conclusion

For the reasons set forth above, Defendant's motion to dismiss will be granted in part and denied in part. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge